We'll hear argument first this morning in Case 12-1226, Young v. United Parcel Service. Mr. Bagenstos. Thank you, Mr. Chief Justice, and may it please the Court. If Peggy Young had sought an accommodation for a 20-pound lifting restriction that resulted from any number of conditions, whether acquired on or off the job, the summary judgment record reflects that UPS would have granted that accommodation. But because Peggy Young's 20-pound lifting restriction resulted from her pregnancy and not from one of those conditions, UPS rejected her request. That, we submit, is a violation of the second clause of the PDA, which, if it means anything, must mean that when an employee seeks an accommodation or benefit due to her pregnancy, that she is entitled to the same accommodation that her employer would have given her. Kennedy, but what you make it sound as if the only condition that was not accommodated was a lifting restriction because of pregnancy, and I didn't not understand that to be the case. I mean, that's the way you start. You want me to say that it's only pregnancy, unless I've missed something. Well, so I think on the summary judgment record here, Your Honor, the three very broad classes of limitations that UPS accommodates do, at least there's a genuine issue of material fact that they cover the waterfront of everything but pregnancy. But our position is that those three broad classes by themselves, even if there are some conditions out there that they don't cover, create a unique situation. And I think that's the point for your case. It seems to me that you started out by really giving a misimpression. Well, Your Honor, I would submit that that's not right. I would submit that in the summary judgment record, UPS acknowledges that they provide accommodations to people with on-the-job injuries, but also the summary judgment record shows that UPS provides accommodations to drivers with off-the-job injuries that result in DOT disqualification, and UPS has not been able to point to a single driver who has a lifting restriction similar to my client, Peggy Young's, who didn't get accommodated, who was not pregnant. So I think that's the point. Ginsburg, what would your case be if, let's accept for argument's sake, if there's a category, people who are injured off-duty, who do not get light work assignments? So you've pointed to three large categories that do, but let's suppose one category doesn't. Yes. So in that case, our position would be, as the plain text of the statute demands, that the employer would be required to treat the pregnant plaintiff the same as those classes of employees who get accommodations who are not pregnant. So it doesn't have to be read that way. It could be read that way, and it could also mean that if you give it to employees generally, you have to give it to pregnant employees, although there may be special classes. I think one of the briefs had an example about, you know, if you have your senior employees driven to work when they are unable to drive themselves, you have to do the same for pregnant women. Would you say that that's the case? No. We would not say that. And we would not say that because our position is that the statutory text requires that employers provide workers who are disabled by pregnancy the same treatment they would receive if they themselves had a similar – had a condition with a similar effect on the ability to work, but that had a different source. So what the statute prohibits is discrimination based on the source of the workplace limitation, not based on seniority, not based on position within the company. What if I were to say, Mr. Breyer, suppose – I mean, we have a brief, as you've said, and we don't give many of these benefits to anybody. And suppose they do, though, give a benefit to a truck driver who has driven over a particularly difficult mountain pass, you know, where he had gotten himself in some danger. Now, the harm or the disability is lifting precisely the same. It's just that the source was different. You see, this came from taking some truck, but doing something special with it. And, again, it's a kind of most favored nation problem. I don't know that source gets you out of it. Is – what do you say about that? So I think as to that, the important point is that that is an example of what may be an idiosyncratic decision by an employer to provide an accommodation to a particular employee. I think as Justice Sotomayor says to me, I don't know that it's idiosyncratic, you see, because I don't know all the workplaces, and I can't imagine that employers have all kinds of different rules for different kinds of jobs. And you – are you saying as long as there's one job in respect to which, let's say, they give them benefits of $1,000 a week, when you're hurt on this job, but not on others, then you have to give them to all pregnant women who hold different jobs. Now, I think the answer to that must be no, but the problem for that and for you is how do you distinguish your situation from that? Right. And I think actually what Justice Scalia's question to me a minute ago actually contains the seeds of the answer to that. So it seems to me, I might agree, that an employer that provides a particularly good deal to a single non-pregnant employee doesn't set the standard. A single? There's a class of people. A small – right. So – but when you have an employer that provides to a large class, to its employees generally, to many of its employees, this accommodated work treatment. I see – I see that now. It sounds – the other question I have, and it's the only other one, is that it did seem to me there is a way, given your theory, it's a quite easy way for you to win. And that would be to bring a disparate impact claim. And that's what I thought disparate impact claims were about. So if you didn't bring the disparate impact claim, and therefore, what am I to do? Because I don't know that you want to twist the disparate, you know, intent, a claim out of shape when you have such a beautiful vehicle to bring a claim of the kind you just articulated. Well, I think the vehicle to bring the claim of the kind that I articulated is the second clause of the PDA. The second clause of the PDA says that women affected by pregnancy, childbirth or related conditions shall be treated the same as other persons not so affected but similar in their ability or inability to work. You read that as a – you read that as an accommodation provision, basically, and maybe – maybe it is. But let me ask you this question, which goes to the issue of whether the types of accommodations that you would say are required have to meet some reasonableness standard. Let's say there are two categories of employees who have lifting restrictions in their job descriptions. One consists of people who work alone and they lift all the time. A driver who is driving a truck by herself and has to lift heavy packages all the time would fall into that category. The second category would consist of people who lift more occasionally and they do it in a place where there will always be lots of other employees in the same class available to do the lifting. Now, if an accommodation is provided to the workers in the second category, would you say that one must also be provided to workers in the first? No, I don't think so. So our point is precisely that a driver who is pregnant and who has a limitation in childbirth and related to her pregnancy is entitled to the same accommodation her employer would have given her if she had sought it for a different medical condition with the same effect on the employer. But why doesn't that fit – why doesn't that second class fit within your reading of the statutory text? Well, so because in our – in our view, the statutory text, by saying – by drawing this distinction between employees affected by pregnancy, childbirth and related medical conditions and not so affected, saying employers can't draw that distinction, excuse me, and saying instead they look only at the ability to work, what it does is it prohibits discrimination based on the source of the disabling condition. It doesn't prohibit discrimination based on different job classifications. If you have a driver – if an employer says no driver who drives alone is going to get an accommodation, whether for an on-the-job injury, a DOT disqualifying injury, or pregnancy, that's fine because it's the same treatment. Because, Justice Alito, we do not read this statute as an independent, reasonable accommodation requirement. But why then – I guess I'm not quite understanding why you can get the source classifications into a different category from all other classifications. So explain that to me. Well, so, I mean, I think it goes to the statutory text. So, I mean, the statutory text says women affected by pregnancy, childbirth and related medical conditions shall be treated the same, et cetera, as other persons not so affected but similar in their ability to work. What that text is saying is to an employer, don't consider whether this person is affected by pregnancy or not so affected. That's not the basis on which you can compare this employee to other employees. Instead, compare this employee based on ability to work. And remember, this statutory text was adopted in response to General Electric v. Gilbert, which upheld an employer policy that distinguished based on the source of the disabling condition, treated some kinds of disabling conditions differently from pregnancy-related disabling conditions. I think you're reading – you have admitted that other persons can't really be read literally. Other – you have to read things into it. And you would read into it people in the same job classification. But if you can do that, then why can't you also read into it people whose injuries or whose disabilities have the same source? Because once you do that, then the second clause of the PDA doesn't occupy any space. And then Congress should have stopped with the first clause. Congress was doing something with the second clause. It was trying to overturn the Gilbert situation where you had an employer that adopted a policy that, as a formal matter, treated pregnant people the same way it treated non-pregnant people. If you were pregnant, but the reason that you weren't able to work was an off-the-job illness or injury, the General Electric policy in Gilbert would have given you disability benefits. And what this Court said in the Gilbert case was that's not discrimination. It simply doesn't include coverage for pregnancy, but pregnant women aren't fenced off. What this statutory text does is it says, no, employers have to treat pregnancy-related conditions as favorably as they treat non-pregnancy-related conditions. And that's, in fact, how this Court has read the statute since its very first PDA case. In Newport News, what this Court said was that the Act makes clear that it's discriminatory to treat pregnancy-related conditions less favorably than other medical conditions. And here, UPS, with the three very large classes of employees that it provides accommodations to who are not pregnant, is treating pregnancy-related conditions less favorably than other medical conditions. Scalia, you do assert it's a most-favored-nation provision. You have to give the benefits that you give to any other class of employees, right? To any other class of employees. I think that's very important. It doesn't matter whether that class is enormous or small, right? Well, so I think this is text that obviously requires some degree of interpretation. I think Your Honor articulated one way of thinking about it, which is providing this accommodation or benefit to employees generally. And certainly, when an employer provides accommodations or benefits to such large classes of employees who are not pregnant, for example, in the ability to give them a special treatment, it's not just a matter of giving a special treatment.  So I think the record is sufficient to show that in the following sense. So number one, obviously, there's all the on-the-job injuries, which UPS acknowledges they provide accommodations for. Number two, DOT disqualifying conditions that UPS provides accommodated work for, we have presented examples in the record of individuals who have off-the-job injuries, who are similar in their ability to work as Peggy Young, who have been given accommodated work, and UPS hasn't pointed to, in its briefing here, any driver with a similar lifting restriction to Peggy Young, who was not pregnant, who didn't get pregnant. Breyer, you can win your case with that argument, perhaps. So, yes. Yes. Assume that. But that isn't going to help me, which I'm rather selfish about. Because my job here is to write what this statute means for a lot of cases. And writing the words, what it means is if you give a lot of benefits to a lot of employees, but not to the pregnant women, and you don't give it to some employees and not to the pregnant women, and the employer says, look, the impregnant women are like the few we don't give it to, not to the lot we do give it to, employer, you lose. By the time I've written that into the U.S. Code, nobody knows what I'm talking about. You're going to say I need to know how to interpret the words such that they would do, in your view, what you want them to do, which is just what I say. Yes. And so, and I think the important point is, if an employer provides accommodations as a matter of policy to a class of employees who are not pregnant, who are similar in their ability or inability to work to the pregnant plaintiff, and does not provide the same accommodation or benefit to the pregnant plaintiff, it is violating the plain text of the statute which says that women affected by pregnancy are not eligible. Scalia, so you're coming down to most favored nation? And that makes sense, and that's easy for my colleague to describe, he can write that down in his opinion. But unfortunately, it takes out of what you just said the fact that you give them to a lot of employees, because you could have a most favored nation that was two employees, including those who have only worked there for 40 years, a huge seniority. So those are the words that are, that I'm. Sotomayor, I understand, and I understand, and that's why I think this may be an easier case than the one you're. Sotomayor, basically what you're saying, if I understand it, is it's okay to differentiate on the basis of anything but source, which means whether it's work or non-work related. That's, you're reading out of the legislative history the fact that Congress repeatedly said, we're not forcing employers to give benefits for non-work related injuries, but we're going to write it so they have to anyway. So I don't think there's any statement in the legislative history that says we're not forcing employers to give benefits for non-work related injuries. What, there are three statements in the legislative history that Respondent draws a negative inference from. I'm so relieved. So Respondent draws a negative inference from to say, obviously, Congress didn't mean to do that, but to return to Justice Scalia's response there, I mean, the point is the text contains no such limitation. And on-the-job, off-the-job distinctions were certainly known to Congress at the time it adopted this statute. In fact, General Electric v. Gilbert involved a policy that contained an on-the-job, off-the-job distinction, although the flip side of the one in this case. If Congress meant to say that employers have an exception from the general shall be treated the same requirement for an on-the-job, off-the-job distinction, it could have said so. If I might reserve the balance of my time. Certainly. Thank you. Okay. Now at least we'll hear. Mr. Chief Justice, and may it please the Court, the point of the Pregnancy Discrimination Act is to reduce the number of women who are driven from the workforce or forced to go months without an income as a result of becoming pregnant. The second clause of the PDA advances that interest in a narrow but important way. I say the second clause is narrow because it is not a freestanding accommodation requirement like the religious provision of Title VII or like the ADA. And I say it is narrow because there's only one thing that an employer can't do when it affords benefits or accommodations. It can't draw distinctions that treat pregnancy-related medical conditions worse than other conditions with comparable effects on ability to work. And that's the other one. Ginsburg-Miller That wasn't a decision that the government took in the U.S. Postal Service policy. We are told that the government defended a policy that is for all intents and purposes the same as United Postal Service. And more than that, as some briefs called Petitioner's position frivolous, contrived, that was the government's position. So will you explain how the government, I suppose to this day because the Postal Service still retains, as far as we know, the exclusion of pregnant women? Verrilli, Jr. Of course, Justice Ginsburg. It is correct that the Department of Justice defended the Postal Service practices against charges like those that Ms. Young makes in this case. That's correct. We acknowledge that in footnote 2 of our brief to this Court. Since then, however, the EEOC has issued guidance, and that's a very significant fact. Congress has charged the EEOC with authority to interpret this statute and with authority to enforce it. Scalia I thought we felt that we don't give deference to the EEOC. Verrilli, Jr. You don't give Chevron deference to the EEOC, but the government has interests. Scalia Oh, come on. So we give what? What do you call the other kind of deference? I mean, gee, you give that to me, even when I'm in the office. Even when I'm in dissent. I mean, that just means, you know, treat it for what it's worth. Verrilli, Jr. The EEOC sets the enforcement policy for the Federal sector with respect to this issue. That's a significant fact. We took it into consideration in deciding what the position of the United States should be. Kennedy Would your position here be the same if the 2014 guideline had not been adopted? Verrilli, Jr. We didn't take that position before the 2014 guideline had been adopted, Justice Kennedy. And I just don't know how to answer that question, because we took the position in light of the guidance adopted in 2014, which we do consider to be significant and we do have to weigh our interests as enforcer of the law as well as as employer. We did so on a considered basis and we came to the judgment that we thought was the correct judgment about the meaning of the statute. Scalia We don't give you any more deference than we give the EEOC, though, right? Verrilli, Jr. Well, with respect to this, I do think that the Court's got to decide what the best reading of the statute is. Scalia What the best reading is, regardless of what you think. Verrilli, Jr. That's correct. And if I could turn to that, I think, and I hope, hopefully in doing so, answer your question, Justice Alito, and also yours, Justice Kagan. Here's why we think the statutory text — now, maybe it would help if I restated what I think the rule is and then explain where the textual basis comes from. We think the one thing an employer can't do as a result of the second clause is draw distinctions that treat pregnancy-related medical conditions worse than other conditions with comparable effects on ability to work. It's that single thing. And so seniority, full-time work, different job classifications, all of those things would be permissible distinctions for an employer to make that differentiate among who gets benefits. Now, as for the textual basis, I'm looking at the statute here, which is we've got at page 12 and 13 of our brief, and it's also in the last page of the appendix to the statute. It says that — what it says is that among the class of people who are comparable in their ability to work, in other words, similar in their ability or inability to work, as the statute says, women with a pregnancy-related medical condition, in other words, women affected by pregnancy, childbirth or related medical condition, as the statute says, can't be treated worse on the basis of their condition. That's what we think treated the same means in the statute than other workers with non-pregnancy-related medical conditions that impose comparable limitations. Those are other persons not so affected. Kennedy, would you give me your interpolation again? You altered the phrase the same, and the words you added were? On the basis of their condition. And the reason we think that that's the sensible and best reading of the statutory text is because this is focused on the condition and not the person. Breyer, but you start — you get, at the very beginning, you listed three things that you said were reasonable distinctions, because the word I'd like you to focus on is other workers, and the problem is which other workers, because it is easy to construct hypothetical cases where the employer treats some other worker as a person, and the other worker is the same as the statute, and doesn't others. And which distinctions are reasonable and which ones are not, and how do we tell? I'd like to make two points in response, Justice Breyer, the first about the nature of a Title VII claim, and the second about the nature of this kind of an anti-discrimination provision. With respect to the first, I think it's helpful to differentiate between a direct claim of discrimination, disparate treatment, versus a claim proven through the McDonnell-Douglas framework. Now, we think in order to prove a direct claim without going through the McDonnell-Douglas burden-shifting analysis, what you've got to show is that an employer offers an accommodation to a significant class of employees, and that that accommodation fails the test I described earlier. It's got to be a significant class. Now, we think that's this case, we think that's going to be most cases, but in the kinds of examples that Your Honor identified, the one guy driving across the mountain, for example, I think you'd have two issues there. First, when it's one person, you're not going to be able to make a direct case. You go through McDonnell-Douglas, and the employer may well have an explanation for that accommodation that would take it outside of the source of the disability limitation and mean there's no liability. And then with respect to that example, there's a second point to be made, I think, which is that that person who has to drive the particularly dangerous route, for example, may just well be in a different job category and therefore not similar in ability or in ability to work for somebody else. Roberts. Roberts. I would have thought it's those types of cases that present the starkest example of discrimination on the basis of pregnancy. The idiosyncratic one, oh, well, he's doing this, yes, but he's doing that, and then the pregnant woman comes in and says, ah, you know, that's not the same thing. I thought maybe it's the sort of the isolated examples that would be particularly glaring in their discriminatory treatment. Verrilli, Well, Mr. Chief Justice, I guess what I would say about that is that you could certainly bring a McDonnell-Douglas claim against an individual idiosyncratic difference, but then if the employer can show that the accommodation was granted to one not on the basis of a criterion that this sentence in the PDA would forbid, then the employer's then the accommodation is fine, there's no violation. And to get back to the point, that's the — that's — I use the idiosyncratic example not because I'm interested in it, because I think it illustrates something that isn't idiosyncratic. And what I use it to illustrate is the fact that, as here, employers will have classes of people, and the classes may be based on all kinds of different things. But this is a case where there are classes, and some get the benefits equivalent to the pregnancy, and some don't. And how are we supposed to tell which are the criteria that are consistent with the statute and which are not? That's what I found as the difficult question in the case, and that's why I ask it, using the idiosyncratic, simply to illustrate what I think is the problem. Roberts. Yes, of course. Let me get to the second point I wanted to make in response to your question, and then I'll try, after I do that, to give you a very specific response to what you just asked me. The second point is, you know, it is true that some classes are going to be in and some classes are going to be out, but that's how discrimination law operates. If an employer is discriminating against women in promotions, the fact that an employer is also discriminating against overweight men in promotions doesn't make the discrimination against women any less actionable because it just reflects the choice Congress made about whom to protect and whom not to protect. And here, the choice Congress made about whom to protect and whom not to protect is the choice to protect women who have condition, pregnancy-related medical conditions. That's the congressional judgment here. They didn't choose to protect everybody who gets injured off the job. They chose to protect those with pregnancy-related medical conditions. Kennedy, I suppose the employer has a rule, we will, if you have a disability you acquired outside of employment, give you benefits for one month. And it applies that same policy to the pregnant woman. Is that a violation of the statute? No, I think the pregnant woman would be entitled to the one month, but nothing more than the employer gives to everybody else. But nothing more than the one month. Correct. That's correct. Because certain people Why isn't that the discrimination on the basis of the statute? Well, because the statute requires that people be treated the same. And so she would be, the pregnant employee would be treated the same under those circumstances. It doesn't require that. But not if there was a separate category of people who were entitled to benefits for more than one month. Well, the question would be whether those benefits, whether the distinction whether the disentitlement of the pregnant employee was based on the source of her condition, namely pregnancy. If it's based on something else like seniority or full-time status, then of course the statute would be different. Could you please answer my question, which was, do you mean source means on the job and off the job? Is that what this case revolves around? Because I don't know what source means. Briefly. Yes, Mr. Chief Justice, briefly. So I think that on the job versus off the job, that distinction goes to, inevitably goes to the source of the impairment. And of course pregnancy will never qualify under that standard. But this case is not just about on the job versus off the job. It's about on the job versus off the job plus the DOT certification category, which can include people who lose their DOT certification and can't drive as a result of physical conditions other than pregnancy that prevent them from doing the job they have to do, which could include lifting, and the DOT manual, which the Petitioner cites at pages 6 and 7, says exactly that. Thank you. Roberts. Thank you, General. Ms. Halligan. Mr. Chief Justice, and may it please the Court. Justice Breyer, you are exactly correct. Had Petitioner believed that the policy that UPS applied, which was to provide accommodations to employees who are injured on the job, but not to provide accommodations to any employees who sustain a condition incurred off the job, she could have brought a disparate impact claim. We believe she would not have succeeded, but she could have and she did not. She attempted to bring one late in the day. It was dismissed by the district court because it had not been exhausted. But Ms. Halligan, can we talk about the claim that she did bring? Yes. So your reading of the statute basically makes everything after the semicolon completely superfluous, and I think you would agree with that. Absolutely not, Your Honor. The reading that we propose is very straightforward. What Congress said in the second clause, the key words are the same as other persons. What other means is simply distinct from whatever is mentioned first. So employers have to treat pregnant employees the same as some distinct group of non-pregnant employees that are similar in their ability or inability to work, and that's exactly what UPS's policy does. That is what the first provision does. When it says pregnancy is the same as sex, when we say because of sex, we also say because of pregnancy. All of that would be taken care of by that clause. This Court explained in Newport News as well as in CalFed that the function of the second clause is to explain how Title VII principles apply to pregnancy. And the reason that they had to do that was in order to repudiate the logic. So you are saying it's not doing anything new. It's only explaining the old stuff. And, okay, tell me why that's necessary? I'm not saying that, Your Honor. What I'm saying is that in a pregnancy discrimination case, instead of comparing women with men as you would in a typical sex discrimination case, because what the first clause does is bolt pregnancy onto sex discrimination. And so if you compare women and men in a pregnancy discrimination case where you have a policy that facially discriminates against pregnancy, you will nonetheless conclude that there's not sex discrimination because there will be women who are pregnant in the disfavored group, but there will also be women who are not pregnant in the favored group, along with men. I think, again, that that's not necessary because all that the inquiry would be is were you discriminated against because you were pregnant. Yes, I was. No, I wasn't. You don't need any of this other stuff about what the comparator class is. And, in fact, you're creating a kind of double redundancy. It's everything past the semicolon is redundant, but then, moreover, the key words here, which is other persons not so affected but similar in their ability or inability to work, that becomes redundant even within the redundancy. I think to respond to the last point first and then the first, what Petitioner's does is rewrite those words in one of two ways. Initially, Petitioner seemed to be suggesting that if a plaintiff could identify any other single employee who was accommodated, that the pregnant employee would be entitled to the same accommodation. What that would mean is the statute would have to read the same as any other person. It does not. Now Petitioner and the government are both suggesting that the only restriction that this bars is a restriction based on source. Any other restriction, rank, seniority, status, outside legal obligations are acceptable, but it doesn't contain any of those words either, not source, not cause. Kagan. Kagan. Kagan. So that seems a – I mean, that is the question that this language raises, right, which is why source, but why not a seniority limitation or something like that. So can I give you an alternative way to understand what the statute is doing, which is that this – what we ought to be thinking about is McDonnell Douglas. In other words, the – this provides the comparator. It says an employee can find a class of people who are being given an accommodation notwithstanding that those people are similarly situated with respect to work. An employee points to that class. And then in a typical McDonnell Douglas fashion, the employer comes back and says, no, there's a good reason why I'm treating that class differently that has nothing to do with pregnancy. It has something to do with, I always treat more senior employees differently or something like that. And at that point, if the – if the employer makes his case, the employee gets to come back and say, no, that's pretext, in just the way we do with every other discrimination case. And that's what this is all about. It's identifying the comparator that the employee has to identify in the first instance in order to shift the burden to the government to come back with a reason. I think the second clause is highly relevant to the question of comparators, but not in the way that you're suggesting. What the second clause does, as this Court has laid out in Newport News and in CalFed, is to explain that when you are making those comparisons, that you don't look at women and men, which is what you might do, as this Court did in Gilbert, because it's sex discrimination that you are actually classifying the difference. Ginsburg That's the first clause, but, I mean, instead of talking in the abstract, do you give me any example of a case that a plaintiff would lose under the first clause that puts pregnancy together with sex? I'm not sure that you could, but that wasn't the function of the second clause. And particularly in the case of the first clause.  I'm saying second clause adds nothing, even though Congress said, and, it has one clause, because of sex, includes pregnancy, and something in addition. But you're saying it's not really in addition. I think that grammatical connector is very important in understanding how the two clauses relate for the following reason. Petitioner's construction would read the first clause out of the statute entirely. The words in the first clause are, because of. And this Court has consistently understood those words across protected traits to require that discrimination in a – in an intentional discrimination case that you have discrimination that is actually motivated by the protected trait. If the second clause does the work Petitioner suggests, even if you could find the word source in that, which it's not in the text, it would mean that you don't need to show that the protected trait, pregnancy, actually motivated the adverse treatment. So his construction would read that out of the statute entirely. Kagan. Ms. Halligan, what's wrong with my middle ground? It's not the Mr. Bagenstos and the General's ground, because it allows the employer to come back and say, I have a legitimate policy based on seniority, or even I have a legitimate policy based on the source of the injury. But it does put that as a question. Whenever an employee is able to point to a similar – to a class of people who are granted the disability accommodation who aren't pregnant. I just don't think it has any – any anchor in the words of the statute itself. The words are as some – It's quite the opposite. It basically gives a function for what the key words of the statute are other persons not – are not so affected, but similar in their ability and inability to work. What is that doing? What it does is it points to the comparator that sets off the McDonnell-Douglas test, that forces the employer to come back and give a reason for why it is that this ought not to be taken as discrimination against pregnancy. I think that this Court's been clear that the function of the second clause is to repudiate that logic which equates when you look at women and men and you have a pregnancy clause, a policy that discriminates on the basis of pregnancy, you say that's not sex discrimination. What that would also do is to collapse the distinction between disparate treatment and disparate intent. This Court has been clear that that is an absolute line. It said so in Raytheon. Congress tracked that distinction in the 1991 Civil Rights Act. And Justice Stevens in his dissent in Gilbert itself, which this Court said it was codifying when it enacted the pregnancy discrimination act. Sotomayor, if the language after the semicolon were not there, would the language before the semicolon have effectively overruled Gilbert? It would have overruled Gilbert by bolting pregnancy on, but Congress was concerned Now, would it have produced a different result in Gilbert? Suppose the employer has a policy of providing certain benefits for employees who have an injury or a disease, but not pregnancy. Right. Now, if it didn't have the language after the semicolon, would the language before the semicolon have required the employer to treat pregnant women the same as those who had an illness or an injury? I'm not sure that it would have, and I'm also not sure that it would have precluded a court from using the same logic that was at play in Gilbert itself, and that's why those words are there. So is that not the reason for the language after the semicolon, is you have to go further in order to produce a different result in Gilbert? And if that's correct, could you explain what you think the language after the semicolon means? I think the language after the semicolon instructs that, that when you look at a policy that facially discriminates on the basis of pregnancy, what you would typically do in a sex discrimination case is to look at how women and men are treated. And if they are treated differently, you would conclude that there is sex discrimination. What this clause instructs is that when you look at a policy that discriminates on the basis of pregnancy, rather than looking at women and men, which will lead you to the conclusion that there's no sex discrimination, because all the nonpregnant women are to be treated differently. Ginsburg's Clause does. It says, Pregnancy affects, period. And while you have already said that you don't think that the Second Clause does any practical work, that is, you can't conceive of a case where a plaintiff would lose under Clause 1 and win under Clause 2. Well, to be clear, Your Honor, the reason the Second Clause is there is to avoid a case in which a court uses the same reasoning and reaches a different result. This Court also attached special significance to the Second Clause in Johnson Controls. It said that the Second Clause provides a BFOQ for pregnancy specifically, and so it does that work as well. What Petitioner suggests is that the Second Clause somehow permits any distinction except on the job versus off the job. That's a distinction that is wrongstanding and has its root in the Second Clause. Breyer, I'd like just to go back on this very point to what Justice Kagan said. The McDonnell-Douglas test, I think, should come in somewhere. That is, the woman shows that I'm pregnant, I couldn't lift, I wasn't paid anything, and other people who had comparable inabilities were paid. And so we get to, was I qualified like they are? And now a distinction is being made. The employer says, no, you're not, because you didn't drive over the mountain pass, or no, you're not, because you got it off the job. And then we have to decide, is that a pretext? Is it legitimate? And where they're giving it to everybody else and there are very few, it doesn't sound too legitimate. But that test must come in. And so how does it? Does it matter if we put it under the first so-called whatever, you know, intentional as opposed to disparate impact? Will we muck up the law? Were we to say it goes in that part rather than the other part or both parts? Well, I think, if I can, this Court has been clear that McDonnell-Douglas provides a mechanism for providing indirect evidence of disparate treatment, of intentional discrimination. So it's distinct, I think, from a disparate impact case where, as here, you have a facially neutral policy, a policy that says on the job gets accommodation when they can't perform the essential functions of their job. Anyone with an injury or condition that's sustained off the job doesn't. When you have a facially neutral policy like that, you can bring a disparate impact claim. Peggy Young does not. Breyer. But why not if it goes under disparate treatment? Pardon? Why not? Because, of course, the employer will always have a facially neutral policy. It just turns out that this facially neutral policy happens to hit the pregnant women and four other people. And, I mean, that's the kind of thing that we're trying to stop in this statute. So why not bring it in there, in the disparate treatment part, as you say? Two answers, Your Honor. First of all, I think that distinction between a disparate impact claim where you're looking at the adverse effects on a certain class of employees, but you have a facially neutral policy, has been quite as distinct from a policy that discriminates on its face, either directly or indirectly. That's well established. Suppose this, and it's exactly what Justice Breyer is talking about. Suppose you had a policy that said, we're going to provide accommodations for anybody with a non-occupational sickness and accident. Very similar to Gilbert, but without all the other facts of Gilbert. We're just – it's a facial policy, we're going to provide accommodations. But, of course, pregnancy is not a non-occupational sickness and accident. So as a result of this facially neutral policy, pregnant women will not get accommodations. Now, as I understand what you are saying, it's – that's perfectly fine. If a policy distinguishes between occupational injuries and non-occupational injuries. Yes, this is non-occupational sickness and accident. And that would be acceptable. And what a plaintiff who believed that nonetheless there was intentional discrimination of foot, what they would do is they would, under McDonnell Douglas, they would first of all attempt to make a prima facie case by showing that other employees who were similarly situated were being treated differently. The comparators that the Petitioner points to here are not valid because they're not similarly situated. The government agreed to it. You're departing radically from what the Fourth Circuit view in this. The Fourth Circuit did say right up front that this clause, standing alone, is unambiguous. If a group of employees get the benefit, if other employees get the benefit, so must it be that they treat pregnant women. But the Fourth Circuit said, yes, that's what it says, just standing alone, but because it would lead to untoward results, preferential treatment, we're not going to give it that meaning. Well, the First – the Fourth Circuit realized that the two clauses have to be read together, and in fact, to read the second clause, as Petitioner suggests, just reads the first clause out of existence. Justice Kagan, to go back to your question, what an employee could do in that circumstance is to say the policy doesn't treat similarly situated employees the same as me. It treats me worse. The comparators here were not at all congruous. The first set of comparators were individuals who were accommodated under the ADA. The government realizes that they're not similarly situated. Kagan, that's where we disagree, because what this tells you is it tells you what the comparators are. The comparators are any class you can come up with who is – has the same disability and isn't pregnant, and then the employer can come back and say, no, we had a good reason to treat that class of employees differently. And if you buy that with respect to the Gilbert distinction, I don't understand why you wouldn't buy it with respect to any other classification. Because all the second clause is telling you, and Congress was clear and this Court was clear, that the PDA, both clauses in its entirety, were not intended to in any way depart from traditional Title VII principles. It was simply to correct the fact that pregnancy could be sex discrimination. But we absolutely know that what Gilbert said was that kind of policy was legitimate, and that Congress came back and said, no, that kind of policy is illegitimate. It said two things. It said it's illegitimate in the first clause, and it said you cannot, when you are trying to ascertain if there's sex discrimination with a pregnancy policy, break it down into women and men, because you won't get the result Congress wants. Congress says when it's facially discriminatory on the basis of pregnancy, that's sex discrimination. So the comparators do have to be different. You're correct. It's pregnant employees and nonpregnant employees. And – and – Kagan. If I – as I understand the answer to my question, and tell me if I'm wrong, is you're saying with respect to a facially neutral policy as to nonoccupational sickness and health, that you think that that is illegal under the PDA? No, it's legal under the PDA. A policy that – I'm sorry. That distinguishes between occupational and nonoccupational injuries and is evenly applied is absolutely permissible under the PDA. Even if it's – it's exactly the policy that's in Gilbert, and you're saying that's fine? No. The policy in Gilbert singled out pregnancy for disfavor. It didn't. There were lots of other things except for pregnancy that got excluded in Gilbert. The court – If a man had a vasectomy, it got excluded in Gilbert. If somebody got into a bar fight, it got excluded under the policy in Gilbert. If a person had cosmetic surgery, it got excluded under the policy in Gilbert. Gilbert was about much more than singling out. This Court and Congress clearly described the policy in Gilbert as singling out pregnancy, and that's why Congress enacted the PDA, because it was a – But it enacted it to overturn Gilbert, everybody. It's holding hands. And not just some abstract theory, but the results in Gilbert. And as Justice Kagan pointed out, Gilbert was a case where you could point to a lot of other people who were not getting this benefit. One of the – the result that Petitioner and the government suggest, which is instead to say that you can have any distinction you want and it's permissible under the PDA except on the job versus off the job, is far more contorted. That's a distinction that sounds in workers' compensation law. Is it true, essentially, you said that Young's position is most favored nation. Well, yours is least favored nation. It's not least favored nation. The question is, is there another distinct group of employees who are treated the same as the Petitioner? And here there are. And this is where the – This case went off on summary judgment. Yes. So the fact – Mr. Bagenstos has told us that there is not in this record a single instance of anyone who needed a lifting dispensation who didn't get it except for pregnant people. Am I – And if that's the case, in fact, then you lose, don't you? Well, I would like to address that because I think that's a real mischaracterization of the record in a couple of ways. First of all, the district court held squarely that the effort by plaintiffs to characterize this policy as no light duty for pregnancy was wrong. What the district court said, this is at page 59A, is that the actual policy was on the job, ADA accommodations, and DOJ. No, in fact, this is an allegation that, in fact, no one who wanted a dispensation didn't get it except pregnant women. That is also contradicted, Your Honor. But we have – we're on the summary judgment stage, so we don't know what the facts are. No, but we have to look at the uncontroverted evidence. There's uncontroverted testimony in the record, and I would point you to Ms. Martin and Mr. Bryan's testimony, that there were many employees who sustained off-the-job injuries, and the district court held specifically that no light duty was given to any employees, male or female, with any medical conditions not related to work, pregnancy included, at page 56A.  Ginsburg-Rosenzweig-Miller Could you give an example, then? Is there an employee who asked for a dispensation because of a medical condition that restricted her ability to lift to any single employee that wrote back who was on duty and said, sorry, you don't get it because your injury was off-duty? There's not a name provided in the record because one was not elicited by the Petitioner whose burden it was in building a prima facie case, but the record evidence is undisputed that there were many employees who sustained off-the-job injuries. And it's unsurprising. UPS is in the business of delivering any cases. They suffered off-the-job injuries, but we don't know if they asked for a dispensation because the off-the-job injury required that they limit the weight that they could bear. The district court held that UPS's policy is that employees who are unable to perform the essential functions of their job would be required to take leave if their inability stemmed from something off the job. And in a business that involves moving 70-pound packages around all day long, it is certainly the case that as the uncontroverted testimony established, there were many employees who sustained an off-the-job injury that prevented them from doing that job. Scalia, I assume that you disagree with the Petitioner, the Petitioner's proposition that when you take these three classes, namely off-the-job – I'm sorry, on-the-job injuries, ADA injuries, and the – what was the third one? Verrilli, Traffic Certificate. Yeah, yeah, getting disapproved as drivers by DOT, there's almost nothing left. That's what the Petitioner said. We absolutely disagree with that, and there is nothing in the record which suggests that. It is completely without citation or support, and it's completely controverted by the testimony that there were many employees who did sustain an off-the-job injury. So there were three narrow exceptions, absolutely, the three that you identified. But every employee, as the district court held, that sustained an off-the-job injury, pulled their back, turned their knee, whatever it is, couldn't come into work, were not accommodated with the kind of light duty that Ms. – Ms. Breyer said. Breyer, why shouldn't there be a trial on that or further proceedings? If it turns out that they're right, that there were four people who weren't pregnant, and that's all, who didn't get the benefits, meh, that's pretty strong evidence that the employer is discriminating. If there were 400,000 people who got the thing off the job and there were only like 19 people on the job who got the benefit, well, then you have a better case. So why don't we have to look at the facts? First of all, Your Honor, that would be relevant to a disparate impact claim, which the Petitioner did not bring. Secondly, there was extensive discovery in this case. There was summary judgment granted with uncontroverted evidence that establishes exactly the opposite of what you're suggesting. So there's no need to do that. This is a very straightforward case, and but for the effort by the Petitioner to bring the record back into play at this late date, none of this – none of this would be something that you would ever consider at this point. Is there really a dispute about this? Maybe Petitioner's counsel could address it in rebuttal, but is there really a dispute that if a UPS driver fell off his all-terrain vehicle on the weekend and was unable to lift, that that person would not be given light duty? Is that really disputed? There's no dispute at all, and the district court made a square finding exactly to that effect at page 56A and page 35A. I would also direct you in our red brief to page 5, where we set forth Ms. Martin's testimony that she never authorized an accommodation for anyone who was injured off the job. So that's there as well. I'd like to turn briefly, if I can, to the question of the EEOC guidance that the Solicitor General – Sotomayor, but there are individuals who are injured off the job who lose their DOT licenses? There are individuals who lose their DOT certification, and pursuant to the collective bargaining agreement, they are accommodated for some period of time. But those jobs, the individuals who lose their DOT certification, are not light-duty jobs. Those are heavy-lifting jobs, as the district court squarely held. The district court at page 36A and 59A said inside jobs are not light-duty jobs, and the individuals who lose their license can perform any number of demanding physical tasks which Ms. Young could not perform. So they're not comparable in that regard either. With respect to the EEOC guidance, the guidance which was issued two weeks after this Court granted certiorari is a 180-degree change from the position that the government has consistently taken and that the Postal Service, which UPS fairly looked to in trying to ascertain what appropriate conduct was under Federal anti-discrimination laws, the policy that it still has in place today. In addition, the process in issuing that guidance was incredibly rushed. It was not until 2012, as one of the amicus briefs point out, that the EEOC even identified the question of pregnancy accommodations as an emerging or developing issue. There was no notice of comment. The three to two to the original guideline, as I understand EEOC, what they did in 2014, they said, we were terse the first time around. All we're doing in 2014 is explaining what the original, what was the original, it was 79? The original guideline? 79 guidelines simply mimic the language of the statute. In 2012, the EEOC in its strategic plan said that it was looking at addressing the very issue that it opined on in the 2014 guidance as emerging. If the 1979 guidelines stood for what Petitioner suggests, there would have been no need to treat it as emerging. It would have been settled 30 years ago. Finally, I want to point out that this is an area where the democratic process is working as it should and as this Court instructed it should in CalFed. In CalFed, this Court looked at the question of whether or not State statutes which provided preferential treatment to pregnant employees, the statute there provided extra leave and reinstatement rights to pregnant employees, was preempted by the PDA. The Court said the PDA sets a floor. That floor is that you can't single out pregnancy for adverse treatment. States can go beyond that as additional and new challenges are identified. Kagan for the democratic process to work as it should, the PDA has to be given a fair reading. What we know about the PDA is that it was supposed to be about removing stereotypes of pregnant women as marginal workers. It was supposed to be about ensuring that they wouldn't be unfairly excluded from the workplace. And what you're saying is that there's a policy that accommodates some workers but puts all pregnant women on one side of the line. And what you're further saying is that the employer doesn't even have to justify that policy a la McDonnell Douglas. That seems to me a reading of the statute, the PDA, that ignores two-thirds of the text. I'm not saying that the employer isn't subject to a suit under McDonnell Douglas. I'm saying that there are no valid comparators here. That's all that we're saying in that regard. The states are passing the statute. Ginsburg's So if there's any group, essentially, if there's any group that doesn't get the benefit, a group that is non-pregnant, then the pregnant people are out, any group at all. If you had a policy, I'm not sure what one would look like, that singled out pregnant employees plus one other employee. My guess is that you would find that the policy that's at issue here, Justice Ginsburg, distinguishes on-the-job versus off-the-job injuries. That's a distinction that's echoed in State and in Federal law. That's a far cry from a policy that singles out pregnant women. There are nine States or targeting or otherwise primarily disadvantaging. That distinction tracks what Workers' Comp requires, which is payment for employees who are injured on the job, and many employers, including the U.S. Postal Service, have found it advantageous to provide light-duty accommodations so their employees can be at work while they're rehabilitating and provide some productive work for the company. That distinction is as legitimate as you could get. I see my time is up, Your Honor. Roberts. Thank you, counsel. Mr. Bagenstos, you have four minutes remaining. Thank you, Mr. Chief Justice. So I'd like to begin, if I could, with the facts, because Justice Alito did ask, and yes, we certainly do disagree with UPS's assertion here. This case was on summary judgment, and UPS does point correctly to some very general statements in the record by UPS managers that they never authorized these accommodations. However, we point to specific examples in the record of people with off-the-job injuries or illnesses who were DOT decertified, who were given accommodations and not just accommodations that removed them from driving, but also removed them from heavy lifting. That's a factual dispute that has to go to trial. I mean, you really want to have a – you really think you could prove at trial that if somebody is injured in a recreational activity over the weekend that they get light duty, but a pregnant woman does not? Maybe? So if someone is injured over the weekend in a way that leads them to be DOT decertified, yes, and in fact, a UPS manager so testified about a sports injury, we cite that in our opening brief. So, yes, we think so. The second point I'd like to make is about what the two clauses do, and I think this is very important. So the first clause of the PDA, as this Court has said in Newport News and CalFed, overturns the reasoning in General Electric v. Gilbert. So what the first clause says is where Gilbert said, look, discrimination based on pregnancy isn't sex discrimination because there are pregnant women and non-pregnant persons, that's wrong. Instead, because of pregnancy is because of sex, definitionally. That's not what the second clause does. That's what the first clause does. The second clause, as this Court said again in Newport News and CalFed, goes further and overrules the holding. And I think Justice Kagan was exactly correct in describing the facts of Gilbert that the Gilbert holding would not be overturned by – under UPS's reading here, because the Gilbert policy, the one thing we know that Congress meant to say was illegal. The Gilbert policy itself acted – drew lines in pregnancy-neutral ways. It said if you have an off-the-job injury or accident defined as an – off-the-job illness or accident defined as an accidental injury, then you get disability benefits. It just so happens pregnancy isn't an illness and pregnancy isn't an accident in the sense of an accidental injury. And what Congress – we know Congress was trying to do, because Congress said it and this Court has said it, is to overturn the holding there. But UPS's rule simply reprises the rule at issue in Gilbert. If I might return to the point Justice Breyer has made a couple of times in – at various points in the argument. So I – I think the reverse. The second sentence is what does that. The second sentence says you don't worry about whether it's between sexes. You worry about whether the same class of people, people who have injured off-duty, are being treated differently. When they have the same ability to work. I think, Justice Sotomayor, the first clause says you don't worry about whether they're the same sex or not. You don't look at the sexes. No, you do have to worry about it, because it still has to be sex discrimination. Well, no, but the first clause definitionally defines pregnancy discrimination as sex discrimination. It says if you're discriminating because of pregnancy, that is because of sex. And that's – and that's the – that's overturning the Gilbert reasoning coming from Gdoldig, that pregnancy discrimination isn't sex discrimination. The second clause goes further, as this Court's explained, and overturns the holding. Overturns the holding upholding the general electric policy. And so – and I think under UPS's rule, it wouldn't do that. On Justice Breyer's question, basically, how do we deal with a world where there's an employer that treats two different groups of people who are nonpregnant differently? It does shall be treated the same means shall be treated the same as those who get the better deal or those who get the worst deal, right? And I think Justice Ginsburg and Justice Kagan, I think, articulated this well, that their position really would give least favored nation status to pregnant workers, and we know that that can't be something that Congress intended. We know that in part because of what General Verrilli said, that that's not how anti-discrimination law works. The fact that someone else was discriminated against doesn't mean I lose Justice Alito's opinion for the Third Circuit and the Fraternal Order of Police of Newark case articulates the same rule. We know that as well because the purpose of this statute is to say to employers, as Justice Kagan said, you have to treat pregnant workers as just as valued employees as anybody else. And if you think it's valuable to keep these employees on the job, who are injured on the job because they keep valuable work – valuable knowledge within the company, do that for pregnant women. Thank you, Mr. Chaffetz. Thank you, counsel. The case is submitted.